**Ramon Elias OSPINA, Plaintiff,**

v.

**DEPARTMENT OF CORRECTIONS, STATE OF DELAWARE; Department of Public Safety, State of Delaware; Robert Durnan; Clifford M. Graviet; Howard Young; and Robert J. Watson, Defendants.**

Civ. A. No. 89–585–JRR.

United States District Court,
D. Delaware.

Oct. 31, 1990.

---

Carolyn M. McNeice of Warren B. Burt and Associates, Wilmington, Del., for plaintiff.

Diane J. Bartels and Stuart B. Drowos, Deputy Attys. Gen., State of Del., Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

ROTH, District Judge.

### I. *Introduction*

This action arises out of the arrest and detention of plaintiff Ramon Ospina. In his complaint Ospina asserts a number of claims under 42 U.S.C. § 1983 and under Delaware law. The defendants in this suit include Robert Durnan, the Delaware State Policeman who made the arrest; Clifford Graviet, the Superintendent of the Delaware State Police; and the Delaware Department of Public Safety. Also named as defendants are Howard Young, the Warden of the prison where Ospina was detained after arrest; Robert Watson, the Commissioner of the Delaware Department of Corrections; and the Delaware Department of Corrections itself. All defendants are sued in their official capacities. As we discuss

below, only Trooper Durnan is sued in his personal, or individual,[1] capacity.

In response to Ospina's complaint, the defendants have filed the motion to dismiss that is presently before the Court.

## II. *Facts and Procedural History*

■ At the outset it must be noted that the parties have filed affidavits with their briefs on the motion to dismiss. The Federal Rules of Civil Procedure recognize that this has the effect of converting a motion to dismiss for failure to state a claim into one for summary judgment. Fed.R.Civ.P. 12(b). The same Rules, however, specifically state that in these circumstances "all parties shall be given reasonable opportunity to present *all* material made pertinent to such a motion." *Id.* (emphasis added). In the present case no discovery has taken place. At this stage of litigation, then, the parties are in no position to present all material pertinent to a motion for summary judgment. *See Melo v. Hafer,* 912 F.2d 628, 634 (3d Cir.1990) (summary judgment standard not followed in absence of "complete factual record developed during a defined discovery period"). For this reason, we exclude the affidavits from consideration and treat the defendants' motion as one to dismiss the complaint.

In deciding a motion to dismiss for failure to state a claim, this Court will accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them. *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). The Court will not grant dismissal unless it is certain that no relief could be granted under any set of facts which could be proved. *Id.* The relevant facts, as described in Ospina's complaint, are as follows.

### A. Facts

On October 21, 1987, State Trooper Robert Durnan stopped a car being driven by Ramon Ospina on Interstate 95 in the State of Delaware. Durnan made a legal search of the car, discovering a quantity of illegal drugs. Durnan then arrested Ospina and placed him in handcuffs. According to Ospina, Durnan applied the cuffs with such force that Ospina's right wrist was seriously injured. Durnan proceeded to transport Ospina to a police station for interrogation. There the handcuffs were removed for the time being. Although the complaint is not clear about what happened next, it seems that Ospina was again handcuffed (by whom is not stated) for his arraignment and transportation to the Gander Hill prison.

Ospina alleges that, upon arriving at the prison, he requested immediate medical treatment for his wrist injury but was told that he would have to fill out a written request for an appointment. Ospina claims that the pain in his wrist persisted and an "unsightly growth" appeared in the injured area. No medical treatment was provided for eight days. The doctor who finally examined Ospina's wrist concluded, after reviewing x-rays, that nothing was wrong with the wrist. Ospina was given pain medication and was told that the pain would subside. For the next two months Ospina complained of further pain, loss of movement, and enlargement of the growth, but he received no medical care. He was then examined by another medical care provider who "determined that there was an injury to his wrist and more investigation was needed." Before any additional treatment or examination could occur, Ospina was transferred from the Gander Hill prison to the Federal Corrections Institution in Tallahassee, Florida. Ospina states in the complaint that the injury now prevents him from performing routine tasks and from participating in sporting events. He asserts that his wrist is severely damaged and extensive orthopedic surgery is required to repair it.

### B. Procedural Posture

The complaint, while not drafted with great precision, asserts both state and federal claims against the defendants. Each of the six defendants is charged with violating Ospina's civil rights under 42 U.S.C.

---

**1.** In § 1983 actions, "personal capacity" and "individual capacity" are synonymous terms. *Kentucky v. Graham,* 473 U.S. 159, 165 n. 10, 105 S.Ct. 3099, 3105 n. 10, 87 L.Ed.2d 114 (1985).

§ 1983[2] and with violating duties imposed by Delaware law.[3] Ospina seeks retrospective relief in the form of damages, Complaint ¶ 1, and requests no prospective relief.

The defendants' motion to dismiss asserts that Ospina has failed to state a claim upon which relief can be granted and has failed to join an indispensable party.

For the reasons that follow, the Court concludes that all federal and state claims against all defendants sued in their official capacities must be dismissed. Federal and state claims against Trooper Durnan in his individual capacity cannot be dismissed at this point.

### III. *Discussion*

#### A. Capacity

Before analyzing the merits of the motion to dismiss, it is worth pausing to examine the capacities in which the defendants are sued. The Third Circuit has recently instructed that District Courts must, in determining whether a defendant is sued in his or her personal capacity, official capacity, or both, "look to the complaint and 'the course of the proceedings.'" *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir.1990) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985)). Having engaged in this analysis, we conclude that Ospina intended to sue all six defendants in their official capacities, but intended to sue only defendant Durnan in his personal capacity.

Turning first to the complaint, we note that, despite a defendant's need for "ade-

quate notice that his or her assets are at stake," § 1983 complaints need not specifically identify the capacity in which a defendant is being sued. *Melo, supra*, at 636 n. 7. Rather, we must adopt a "flexible approach" and interpret the pleading. *Id.* A number of the complaint's features argue for the conclusion that Ospina intended to sue only defendant Durnan in his personal capacity. For example, a preliminary paragraph of the complaint explicitly notes that Trooper Durnan "is sued individually and in his official capacity." Complaint ¶ 8. By contrast, the five preliminary paragraphs that correspond to the other defendants do not mention suing "individually". Nor do these five paragraphs mention suing anyone in an official capacity. Rather, each states the name and position of the defendant, as well as the defendant's relationship to the State of Delaware. The paragraph naming and describing defendant Young, the warden of Gander Hill prison, is a good example of the language employed:

> At all times relevant hereto, Defendant Howard Young was serving as warden of [Gander Hill], a prison facility under the direction of the Department of Corrections, State of Delaware and was, at all times relevant hereto, an employee, servant and agent of the State of Delaware and may be served through the office of the Attorney General, State of Delaware.

Complaint ¶ 9. In identical fashion, the paragraphs describing Commissioner Watson and Superintendent Graviet omit any

---

**2.** The complaint in this case states that, as a general matter, "[t]his action is brought pursuant to 42 U.S.C. § 1983, [and] the Fourteenth Amendment to the Constitution of the United States." Complaint ¶ 3. The § 1983 claims are purportedly based upon "the right to be free from unjustified and excessive force." Complaint ¶ 21. Although the complaint does not specify how this right derives from the federal Constitution, the Supreme Court has recently held that all claims that law enforcement officers have used excessive force in the course of an arrest or other "seizure" should be analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, ——, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989).

**3.** Ospina's state law claims stem from alleged violations of "the Constitution and laws of the State of Delaware." Complaint ¶ 3. The complaint states that Defendants Young and Watson violated specific duties imposed by the Delaware Constitution, *id.* ¶¶ 28(i), 31(h), and Code. *Id.* ¶ 31(i). What is more, the complaint suggests that each defendant "acted in a negligent, grossly negligent and wanton manner" by taking or omitting to take a variety of actions. *Id.* ¶¶ 22, 25, 28, 31, 34, and 37. We take the latter to mean that each defendant violated tort duties that exist within the common and statutory law of Delaware.

mention of individual or personal capacity.[4] Indeed, only Trooper Durnan is singled out by being sued "individually," at least in the body of the complaint.[5]

The caption of the complaint provides further evidence that Ospina intended to sue only Trooper Durnan in a personal capacity. The caption lists the defendants as:

> DEPARTMENT OF CORRECTIONS, STATE OF DELAWARE; DEPARTMENT OF PUBLIC SAFETY, STATE OF DELAWARE; ROBERT DURNAN, *Individually, and* as an employee of the Delaware State Police, an agency of the Department of Public Safety; CLIFFORD M. GRAVIET, Superintendent, Delaware State Police, an agency of the Department of Public Safety, State of Delaware; HOWARD YOUNG, Warden, Multipurpose Criminal Justice Facility, a Correctional Institution under the direction of the Department of Corrections, State of Delaware and ROBERT J. WATSON, Commissioner, Department of Corrections, a Department of the State of Delaware,

Complaint at 1 (emphasis added). Once again, Trooper Durnan receives unique treatment from the plaintiff.[6] These two features of the complaint, even when interpreted flexibly, lead to the conclusion that Ospina intended to sue Durnan in his personal capacity, but not the other defendants.

Our determination of the defendants' capacities in this matter is incomplete, however, until we look at the course of the proceedings. In this task we are again guided by the recent decision in *Melo v. Hafer, supra,* in which the Third Circuit reversed the District Court's conclusion

that Barbara Hafer, the Auditor General of Pennsylvania, had been sued only in her official capacity. The panel first reviewed the complaint, noting that the caption listed only the defendant's name, not her job title. The complaint also requested damages from Hafer only and not from Pennsylvania. The Court went on, however, to look at the course of proceedings:

> It appears that Hafer understood that plaintiffs sought to sue her in her personal capacity because she raised the defense of qualified immunity throughout the course of these proceedings, a defense available only for governmental officials when they are sued in their personal, and not in their official, capacity.

*Id.* at 636. This factor, along with the panel's sense of the plaintiff's intentions as expressed in the complaint, led the panel to conclude that Hafer had been sued in her official and individual capacities.

In the present case defendants Durnan, Graviet, Watson, and Young indeed raise this qualified immunity defense. Defendants' Opening Brief at 24. Nevertheless, we are not persuaded that the mere advancement of this defense at this stage of litigation requires an automatic finding that these defendants are sued in their personal capacities. Were we to find otherwise, defendants faced with a complaint such as that filed in this case would be left with a Hobson's choice. Raising the immunity defense in a motion to dismiss under Rule 12(b) would be tantamount to a concession that the plaintiff had sued defendants in their personal capacities, even where the plaintiff may not have intended to do so. On the other hand, defendants could decide to postpone raising the defense until later developments clarified the defendants' capacities. This, however,

---

**4.** The same is true of the paragraphs naming and describing the Departments of Public Safety and Correction.

**5.** In *Melo v. Hafer, supra,* one of the complaints explicitly asserted monetary claims against the defendant in her "personal capacity". Ospina's complaint does not make such an assertion. To the contrary, Ospina seeks damages "jointly and severally from all defendants." Complaint at 14. He does not specify the relationship of damages to the defendants' capacities.

**6.** By contrast, one of the complaints considered in *Melo v. Hafer, supra,* mentioned the defendant only by her name in the caption. *Id.* at 636. The caption stated neither her capacity nor her relationship to state government. This rather general characterization of the defendant factored into the Third Circuit's decision that the plaintiff had not sued defendant in only her official capacity.

might result in keeping some defendants in the suit long after they should have been dismissed, thus wasting the time and resources of both the official defendants and the courts. Of course, the plaintiff is not required to identify specifically the capacity in which a defendant is sued. *Melo, supra,* at 636 n. 7. At the same time, the defendant cannot be expected essentially to stipulate that she or he is sued in a personal capacity where a fair reading of the complaint would lead to the opposite conclusion.

From our evaluation of both the complaint and the course of the proceeding thus far, we hold that Ospina intended to sue only Trooper Durnan in his personal capacity.[7]

## B. Claims Against Defendants Sued In Their Official Capacities

We now turn to the federal and state claims asserted against all defendants in their official capacities.

### 1. *Section 1983 Claims*

■ As described above, Ospina claims that all six defendants violated his right to be free of excessive force during arrest and detention and neglected to care for his alleged injury. These claims are brought under 42 U.S.C. § 1983, which reads in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. The defendant in a § 1983 action must, of course, be a "person" within the meaning of the statute. Unfortunately for the plaintiff in the present case, the Supreme Court has held that neither a State nor its officials acting in their official capacities are "persons" under § 1983. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, ——, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). Therefore, all of Ospina's § 1983 claims against the defendants in their official capacities must be dismissed.

### 2. *State Law Claims*

In addition to his § 1983 claims, Ospina has also alleged that the defendants, acting in their official capacities, have breached duties imposed by Delaware constitutional, statutory, and tort law. In reply, the defendants argue that these claims should be dismissed because the Eleventh Amendment to the United States Constitution[8] bars suits by private parties who, like Ospina, seek to impose a liability which must be paid from public funds in the state treasury. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). Under this analysis, a federal District Court cannot entertain a suit against an arm of the state, such as the Depart-

---

**7.** The cases cited in *Melo v. Hafer, supra,* do not contradict this result. In each case the immunity defense was raised throughout the long course of litigation, not simply in the defendant's first response to the complaint. *See Melton v. City of Oklahoma City,* 879 F.2d 706, 726–27 & nn. 32–33 (immunity defense raised at trial, in pre-trial order, and in answer), *reh'g granted in part,* 888 F.2d 724 (10th Cir.1989); *Conner v. Reinhard,* 847 F.2d 384, 394 n. 8 (7th Cir.) (case had gone to trial), *cert. denied,* 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988); *Lundgren v. McDaniel,* 814 F.2d 600, 604 (11th Cir.1987) (defense raised in jury instructions, in pre-trial stipulation, in motion for summary judgment, and in answer). *Compare Gregory v. Chehi,* 843 F.2d 111, 119 (3d Cir.1988) (complaint's demand for punitive damages from all

defendants considered a key factor). The *Melo* panel, of course, reversed a dismissal that occurred at an earlier stage, i.e., after an answer but before discovery was complete. The *Melo* complaints, however, were somewhat more ambiguous regarding defendant's capacity than is true here.

**8.** The Eleventh Amendment reads as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

ments of Corrections and Public Safety in the present matter. *See Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984) ("a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment"). Likewise, state law claims against a state official in his or her official capacity are barred because the state is the real party in interest. *Muth v. Central Bucks Sch. Dist.,* 839 F.2d 113, 128 (3d Cir.1988), *rev'd on other grounds,* 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989); *Laskaris v. Thornburgh,* 661 F.2d 23, 25 (3d Cir.1981). The plaintiff here concedes as much in his brief. Plaintiff's Answer to Defendant's Opening Brief at 11, 15. Therefore, the state law claims against defendants sued in their official capacities must be dismissed unless, as Ospina maintains, the state has waived its Eleventh Amendment immunity.

■ Ospina argues that Delaware has waived its Eleventh Amendment immunity by purchasing insurance to cover liability arising from incidents like those alleged in the complaint. Even assuming that such insurance exists, we find that there has been no waiver of Eleventh Amendment immunity.[9] A state may waive this immunity in its statutes or constitution, or by participating in certain federal programs. *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 3145 n. 1, 87 L.Ed.2d 171 (1985). Such waiver must, however, be in the form of an "unequivocal indication that the State intends to consent to federal jurisdiction that would otherwise be barred by the Eleventh Amendment." *Id.* This requires either "the most express language or ... such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Edelman,* 415 U.S. at 673, 94 S.Ct. at 1360 (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)) (participation in federal program).

■ Since there is no allegation or argument that Delaware waives its Eleventh Amendment immunity through participation in a federal program, we thus must examine the Delaware Constitution and Code. Article I, Section 9 of the Delaware Constitution, in an apparent waiver of the defense of sovereign immunity, states that "suits may be brought against the State, according to such regulations as shall be made by law." Del. Const. art. I, § 9. Section 6511 of Title 18 of the Delaware Code expands on this by providing that:

> The defense of sovereignty is waived and cannot and will not be asserted as to any risk or loss covered by the state insurance coverage program, whether same be covered by commercially procured insurance or by self-insurance ...

18 *Del.C.* § 6511. *See also* 10 *Del.C.* § 4005 (authorizing purchase of insurance); 18 *Del.C.* § 6503 (mandating insurance coverage and describing its scope). The question, then, is whether waiver of the "defense of sovereignty" is a waiver of Eleventh Amendment immunity.

We are convinced that the Delaware Constitution and Code do not unequivocally indicate that Delaware has consented to federal jurisdiction. There is some earlier Third Circuit precedent suggesting that a statutory scheme dealing with insurance may operate to waive Eleventh Amendment immunity. *West v. Keve,* 571 F.2d 158, 164 (3d Cir.1978). On the other hand, the Supreme Court's more recent insistence in *Atascadero, supra,* that a waiver be *unequivocal* substantially reduces the force of this suggestion. While the Third Circuit has not specifically considered the effect of the *Atascadero* and *Pennhurst* decisions on the idea that waiver can be deduced from a scheme like that at issue here, the Fourth Circuit has done so. In 1988, a panel of that Court commented that,

> [b]ecause the eleventh amendment protects the state specifically against suit in federal court, a state's general waiver of

**9.** While we do not rely on the affidavits filed with the briefs in this matter for our decision, we note that the defendants have asserted that such insurance does not exist, and that the State of Delaware is "self-insured." If this proves true, any judgment against the state or its officers sued in an official capacity would be paid from the state treasury.

sovereign immunity will not suffice to waive the immunity conferred by the eleventh amendment. Instead, a state statutory or constitutional provision will constitute a waiver of eleventh amendment immunity only if it contains an "unequivocal" statement of the state's intention to subject itself to suit *in federal court.*

*Westinghouse Elec. Corp. v. West Virginia Dept. of Highways,* 845 F.2d 468, 470 (4th Cir.) (citations omitted), *cert. denied,* 488 U.S. 855, 109 S.Ct. 143, 102 L.Ed.2d 116 (1988). We agree with the *Westinghouse Electric* panel's conclusion that neither a general waiver of state sovereign immunity, nor a statute providing for the procurement of insurance on behalf of the state, amounts to an unequivocal indication of the state's intention to subject itself to suit in federal court. In reaching this conclusion we build on the reasoning of the District Court in *West v. Keve,* 541 F.Supp. 534 (D.Del.1982) (on remand), a decision that applied a less stringent test than that later enunciated in *Atascadero.* There Judge Wright held that the Delaware Code's general waiver of "the defense of sovereignty" as to risks covered by the state insurance program was not a "clear declaration" of the Delaware legislature's intent to waive Eleventh Amendment immunity. *Id.* at 538. If this statutory scheme was not then a "clear declaration" of such intent, it cannot now be an "unequivocal indication" of the same. *Atascadero,* 473 U.S. at 238, 105 S.Ct. at 3145. We therefore hold that the provisions of the Delaware Constitution and Code at issue here do not waive the Eleventh Amendment immunity enjoyed by defendants. The state law claims asserted against them in their official capacities must be dismissed.

C. Claims Against Trooper Durnan In His Personal Capacity

We now turn to claims against Trooper Durnan in his personal capacity. Trooper Durnan defends against these claims by asserting that he is protected from § 1983 liability by qualified immunity and that he is protected from liability on the remaining negligence claim by the Delaware tort claims act.

1. *Section 1983 Claim: Qualified Immunity*

■ Trooper Durnan argues that the § 1983 claim made against him in his personal capacity must be dismissed because he is entitled to qualified immunity for his conduct. In reviewing a qualified immunity claim, the District Court must determine whether a reasonable officer could have believed the defendant's actions were lawful in light of clearly established law and of the information the officer possessed. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In other words, immunity is not available if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right". *Anderson,* 107 S.Ct. at 3039. Therefore, we must first determine whether the actions Ospina alleges Durnan to have taken are actions that a reasonable officer could have believed lawful. *Anderson,* 107 S.Ct. at 3042 n. 6.

> If they are, then [Durnan] is entitled to dismissal prior to discovery. *Id.* If they are not, and if the actions [Durnan] claims he took are different from those [Ospina] alleges (and are actions that a reasonable officer could have believed lawful), then discovery may be necessary before [Durnan's] motion ... can be resolved.

*Anderson,* 107 S.Ct. at 3042 n. 7.

As a threshold matter, there is some dispute about what right is involved here. Apparently overlooking Ospina's claim that his injuries began *during* the arrest, Durnan simply states that he is "unaware of any constitutional or statutory right not to be handcuffed *after* arrest in detention." Defendants' Brief at 26 (emphasis added). Ospina, on the other hand, contends in circuitous fashion that the defendants violated the right to be free of excessive force during and after an arrest, a right that derives from "the due process clause of the

580

Fourteenth Amendment". Plaintiff's Brief at 20–22. Because we have before us a motion to dismiss, we accept the plaintiff's characterization of the right allegedly violated here. Unfortunately, neither side cites any authority that would help us to determine whether "in the light of preexisting law the unlawfulness [was] apparent" at the time of the incident in question. *Anderson*, 107 S.Ct. at 3039. We thus undertake this analysis alone.

A review of the law extant at the time of Ospina's arrest leads us to conclude that the right to freedom from excessive force in an arrest was "clearly established" when Durnan arrested Ospina in 1987. Two years after the arrest, the Supreme Court declared in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), that claims of this nature are to be analyzed under Fourth Amendment standards. The *Connor* Court seemed perturbed that many lower courts had "assume[d] ... that there is a generic 'right' to be free from excessive force, grounded not in any particular constitutional provision but rather in 'basic principles of § 1983 jurisprudence.' " *Id.* 109 S.Ct. at 1870 (Scalia, J.). One could certainly extrapolate from this comment that the Court would now conclude that a "generic" right to freedom from excessive force could not have been "clearly established" before the 1989 *Graham* decision was handed down. Yet *Connor* did not establish a new right. Rather, it simply instructed courts to engage in Fourth Amendment analysis where, in the past, they had applied a different analysis. In short, *Connor* merely refocussed judicial treatment of an existing right.

The question here, however, is whether the right to be free of excessive force was "clearly established" in 1987, not whether the right was properly categorized. By 1987 the Third Circuit had indeed clearly enunciated the principle that an arresting officer may not apply excessive force while effecting an arrest. For example, in 1981 a Third Circuit panel held that

A law enforcement officer's infliction of personal injury on a person by the application of undue force may deprive the victim of a fourteenth amendment 'liberty' without due process of law.... "The protection of fundamental liberties by the due process clause and the eighth amendment extends to protection from an official's abusive exercise of his powers to inflict grossly undue harm."

*Black v. Stephens*, 662 F.2d 181, 188 (3d Cir.1981) (quoting *Rhodes v. Robinson*, 612 F.2d 766, 772 (3d Cir.1979)) (citation omitted), *cert. denied*, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). The constitutional infirmity of such police conduct thus was "clearly established" at the time of the arrest in this case.

Because it was clearly established in 1987 that application of excessive force in the course of an arrest could violate the constitutional rights of the arrestee, we now turn to whether a reasonable officer could have believed Durnan's actions to be lawful. Here both sides concede, at least for purposes of this motion, that Ospina offered no resistance to the arrest made by Trooper Durnan. If we accept Ospina's allegation that Durnan applied excessive, injurious force in the face of no resistance, then we must conclude that Durnan's actions were not those that a reasonable officer would have believed lawful. Therefore, Durnan is not entitled to dismissal prior to discovery. *See Anderson*, 107 S.Ct. at 3042 n. 6. Since Durnan contradicts the claim that excessive force was applied, we conclude that more discovery is necessary on whether he is entitled to qualified immunity. Ospina's § 1983 claim against Durnan in his individual capacity may proceed for the time being.[10]

## 2. *State Law Claim: Statutory Immunity*

We next turn to Ospina's claim that Durnan, acting in his personal capacity, breached duties imposed by Delaware common law. Durnan appears to argue that this

10. Because "broad ranging discovery" can be "particularly disruptive of effective government," defendant Durnan will be permitted to

resolve the qualified immunity question at the earliest possible stage of this litigation. *Anderson*, 107 S.Ct. at 3042 n. 6.

claim must be dismissed because (1) the facts alleged in the complaint do not support a tort claim and (2) he is shielded from liability by the immunity provisions of the Delaware Code.

Having examined the complaint, we conclude that it does support a negligence claim. Count I of the complaint states that Durnan acted in a "negligent, grossly negligent and wanton manner" and that he "caused extensive injuries and permanent damage." These statements essentially plead the basic elements of negligence.

■ We also conclude that Durnan is not entitled to dismissal based on statutory immunity. The Delaware Tort Claims Act states in relevant part that:

> Except as otherwise provided by the Constitutions or laws of the United States. or of the State, ... no claim or cause of action shall arise ... against ... any public officer or employee ... in any civil suit or proceeding at law or in equity ... where the following elements are present:
>
> (1) The act or omission complained of arose out of and in connection with the performance of an official duty requiring a determination of policy, the interpretation or enforcement of statutes, rules or regulations, the granting or withholding of publicly created or regulated entitlement or privilege or any other official duty involving the exercise of discretion on the part of the public officer [or] employee ...
>
> (2) The act or omission complained of was done *in good faith* and in the belief that the public interest would best be served thereby; and
>
> (3) The act or omission complained of was done *without gross or wanton negligence;* ...
>
> ... provided further that in any civil action or proceeding against ... a public officer [or] employee ... the plaintiff shall have the burden of proving the absence of 1 or more of the elements of immunity as set forth in this section.

10 *Del.C.* § 4001 (emphasis supplied). Durnan argues that Ospina has failed to allege facts which support the absence of any one of the elements of immunity. We disagree, and find for present purposes that the complaint, when construed in the light most favorable to Ospina, alleges facts which could show either the presence of gross or wanton negligence or the absence of good faith. Therefore, the state tort claim cannot at this time be dismissed.

### D. Failure To Join an Indispensable Party

■ Finally, Durnan argues that Ospina's failure to join the health care providers who examined Ospina in prison requires this Court to dismiss the entire action. In particular, Durnan maintains that these health care providers are indispensable parties without whom this Court cannot "in equity and in good conscience" proceed. Fed.R.Civ.P. 19(b). His reasoning in this regard consists only of the conclusion that Ospina's failure to join these persons is "a fatal flaw" and some commentary about who should be liable for the consequences of medical decisions. Defendant's Opening Brief at 30. We assume, therefore, that Durnan believes the health care providers should be joined because they are potential joint tortfeasors.

The settled rule in the Third Circuit is that a defendant's right to contribution or indemnity from an absent party does not render that absentee indispensable pursuant to Rule 19. *Bank of America v. Hotel Rittenhouse Assoc.,* 844 F.2d 1050, 1054 (3d Cir.1988). *See also Gold v. Johns–Manville Sales Corp.,* 723 F.2d 1068, 1076 (3d Cir.1983); Fed.R.Civ.P. 19 advisory committee's notes (rule is not meant to contradict "settled authorities holding that a tortfeasor with the usual 'joint and several' liability is merely a permissive party to an action against another with like liability"). In light of this rule, we hold that the medical care providers are not indispensable parties in this case.

### IV. *Conclusion*

An appropriate order will be entered granting the defendants' motion to dismiss all claims against all defendants sued in their official capacities and denying defendant Durnan's motion to dismiss claims filed against him in his individual capacity.

582

Defendants' motion for summary judgment is denied, as premature, with leave of the Court to resubmit it at a later time, if appropriate.